## A11A0011. NELOR v. THE STATE.
### (709 SE2d 904)

ELLINGTON, Chief Judge.

Bernard Nelor appeals from an order of the Superior Court of Gwinnett County which denied a recommendation filed by the Department of Behavioral Health and Developmental Disabilities that Nelor be moved to a facility for outpatient involuntary treatment. Nelor contends that the trial court erred in concluding that he still meets the criteria for inpatient involuntary treatment. Because the record shows that Nelor satisfied his burden of showing that he no longer meets the criteria for inpatient involuntary treatment, we must reverse.

OCGA § 37-3-1 (9.1) provides that mentally ill persons require inpatient involuntary treatment if they present a substantial risk of imminent harm to themselves or others, or are so unable to care for their own physical health and safety as to create an imminently life-endangering crisis. If, during a hearing, a person who has been involuntarily committed for inpatient treatment is able to overcome the rebuttable presumption by showing that he or she no longer requires inpatient involuntary treatment,[1] however, then a trial court may order the person be conditionally released pursuant to OCGA § 17-7-131 (e) (5). *Gray v. State*, 295 Ga. App. 737 (673 SE2d 84) (2009).

During the hearing, the trial court must determine whether the person has rebutted the presumption of a continued need for inpatient treatment by showing, by a preponderance of the evidence,

---

[1] Under OCGA § 24-4-21, a person's mental state, once proven to exist, is presumed to continue, but this presumption is rebuttable.

that such treatment is no longer required. *Nagle v. State*, 262 Ga. 888, 892 (2) (b) (427 SE2d 490) (1993). "The court must consider *all* credible and relevant expert and other evidence presented at the hearing and contained in the trial record on the issue of conditional release." (Footnote omitted; emphasis supplied.) *Gray v. State*, 295 Ga. App. at 737. In fact,

> because the factfinder must weigh the evidence and may not arbitrarily ignore it, overwhelming opinion evidence of a medical condition may not be summarily rejected by the factfinder. When proof of [a defendant's mental state] is overwhelming, [the factfinder] may not rely solely on the rebuttable presumption [that the defendant's prior mental state has continued]. It is a [factfinder's] function to determine the credibility of witnesses and the probative value of testimony.

(Citations and punctuation omitted.) *Nagel v. State*, 262 Ga. at 891 (2) (a).

On appeal from an order deciding whether a person may be conditionally released from inpatient involuntary treatment, this Court must determine whether, after reviewing the evidence in the light most favorable to the State, a rational factfinder could have found that the person failed to prove by a preponderance of evidence that he was no longer in need of inpatient involuntary treatment. Id. at 892 (2) (b). In order for this Court to implement this standard of review, the trial court's order must supply specific findings of fact regarding the evidence presented and the court's conclusions based thereon. Id.; *Gray v. State*, 295 Ga. App. at 737.

The record reveals that, in 2004, the State charged Nelor with aggravated assault and kidnapping with bodily injury arising out of the alleged sexual assaults of two women. The trial court found that Nelor was mentally ill and declared him incompetent to stand trial, and ordered that he be involuntarily committed to the custody of the Department of Human Resources ("DHR"). In 2007, the trial court entered an order finding that, because Nelor was "mentally ill with a diagnosis of Mental Retardation," he met the criteria for civil commitment under OCGA § 37-3-1 (9.1). The trial court ordered that Nelor receive inpatient involuntary treatment.

In January 2009, a forensic psychologist with the DHR reported to the trial court that, while Nelor remained incompetent to stand trial, it was the consensus of his treating psychologists that he no longer met the criteria for inpatient treatment. The DHR recommended that Nelor be moved to a group home setting to continue his involuntary treatment. Following a hearing on the recommendation,

the trial court found that Nelor continued to meet the criteria for civil commitment but denied the DHR's recommendation that he be moved to an appropriate facility for outpatient involuntary treatment. Nelor appealed that order to this Court, and we vacated it in an unpublished opinion (304 Ga. App. XXV) because the order did not contain the requisite factual findings. Following remand, the trial court entered an amended order, and Nelor brought the instant appeal.

On July 10, 2009, the trial court conducted a hearing on the issue of Nelor's continued need for inpatient involuntary treatment. The record shows that, at the time of the hearing, 32-year-old Nelor was diagnosed as moderately mentally retarded, with an IQ in the range of 43 to 55. Prior to his arrest and commitment, he had no history of drug or alcohol use or criminal behavior. Nelor did not suffer from a psychotic or mood disorder and, because he was not mentally ill, he was not prescribed any psychotropic medication. Nelor's treating psychiatrist testified that, during Nelor's years of commitment, he demonstrated no behavioral problems, had no episodes of hostility, impulsivity, or general "acting out," and was, in fact, "quite docile." Other therapists reported that Nelor was "consistently sociable, friendly, and happy" and that "[t]here have been no episodes of impulsive, aggressive, or sexually inappropriate behavior." He remained calm and cooperative during therapy and group activities.

Nelor was given "Level D" privileges by the staff at Georgia Regional Hospital in Savannah, which meant he could walk freely on hospital grounds. He was compliant with hospital rules and always returned to his room when required and "sign[ed] in appropriately." He was not permitted to leave hospital grounds unsupervised, however, because of concerns that he lacked the cognitive ability to do so safely. There is no evidence in the record that Nelor ever attempted to leave hospital grounds unsupervised or that he refused to comply with hospital rules or the directions of hospital staff. To the contrary, Nelor reported at least one infraction of hospital rules by another patient to the staff.

Nelor's treating psychiatrist also testified that, as long as Nelor was in an appropriate environment, he posed absolutely no danger to himself or others. He was not homicidal or suicidal, and he required no medication. The psychiatrist testified that Nelor would benefit from being employed and productive and from continued academic and social skills training. Nelor had already completed courses in stress management and basic social skills. Because of his limited cognitive functioning, however, Nelor was susceptible to peer pressure and would require supervision in an appropriate, structured setting. In the psychiatrist's opinion, Nelor no longer met the criteria for inpatient civil commitment and would benefit from

outpatient treatment. This opinion was shared by Nelor's treatment team, and no one testified to the contrary.

Nelor's social worker testified that, in 2007, she began working to find a suitable outpatient involuntary treatment provider for him. After researching available facilities, she chose Consumer Care Corporation ("CCC"), a provider that offered "24/7" supervised, outpatient care in a group home setting. Nelor was escorted to the group home for a "meet and greet" session, which went "extremely well." The social worker confirmed that Nelor's social security benefits covered these "community residential alternative services" and that space was available for him in the group home. The group home would provide continuous supervision during day and evening activities, which included academic classes, counseling, grocery shopping, exercise, church and doctors' visits, and any work activities, like basic, in-home "piecework." Nelor would never be unsupervised and would never be allowed off the premises unescorted. He would reside in the group home indefinitely as an involuntary outpatient until a court authorized a change in his status.

Specifically, Nelor would live in a licensed, regulated, and regularly State-monitored "Community Living Arrangement," one of nine group homes managed by CCC. The homes consist of two live-in supervisors and up to three male patients in each single-family residence. The homes are in residential communities and the neighbors have been informed of the nature of the homes and the status of the residents. At the time of the hearing, Nelor was to be the only resident in the group home besides the live-in supervisors. Future residents and Nelor's "individual service plan" would be determined and "built around [Nelor] and his needs." CCC retained the services of a private psychologist and board-certified behavioral specialists, both of whom would treat Nelor at regular intervals. Nelor would also have access to doctors and social workers as needed. CCC provides an "individual service plan" for each of its residents, and would create one for Nelor should he be admitted to the home. CCC's in-home supervisors are specially trained and certified in caring for special needs patients and are authorized to temporarily restrain Nelor should he ever attempt to hurt himself or others or to damage property. If Nelor's behavior changed such that he was no longer a suitable resident for the home, the home would notify the Department of Human Resources of that fact so that a different placement could be arranged with the court's approval. Should he become assaultive or manage to leave the premises without authority, the home would notify the police. The home has safeguards in place, including an emergency panic button, to notify CCC administrators of an immediate problem.

Nelor also testified and expressed a desire to live in the group

home, saying it was "a good idea." He looked forward to playing basketball and learning to swim. He stated that he would follow the rules of the home.

In its amended order, the trial court found that Nelor continued to present a risk of imminent harm to himself and others, citing these reasons for denying Nelor's request of outpatient involuntary commitment: (1) "the continued presence of 'destabilization factors' such as peer pressure, unproductiveness, and illiteracy[,]" (2) "Consumer Care Corporation has no legal right or authority to prevent the defendant from leaving the group home if he chose to do so[,]" and (3) "[t]here was no individualized service plan offered as part of the release." These concerns, however, are unsupported by the record. First, the group home would have only two other suitable patient occupants, both of whom would be under the supervision of live-in supervisors and would, therefore, have little opportunity to pressure Nelor into misconduct. The home would also provide academic classes, basic skills training, and the opportunity to do things that the hospital environment did not offer, like swimming lessons, church, and grocery shopping — activities that would keep Nelor productive and engaged. The record does not support the presence of "destabilizing factors." Second, it is clear from the record that Nelor would not be permitted to leave the group home unsupervised, that doing so would be a breach of the terms of his involuntary commitment, and that his supervisors would take immediate action to return him to the facility or to ensure that he is appropriately restrained, if necessary. Further, Nelor has no history of escape and demonstrates no desire to leave his confinement. Third, the manager of the group home testified that, as soon as patients are admitted into the group home and evaluated, an individualized service plan is created. There is no statutory requirement that a plan exist prior to release. Finally, and most significantly, there is no evidence to support the court's finding that Nelor poses a substantial risk of imminent harm to himself or others, or is so unable to care for his own physical health and safety as to create an imminently life-endangering crisis, and, thus, is in need of continued involuntary inpatient treatment.

After carefully reviewing the evidence in the light most favorable to the State, we conclude that the preponderance of the evidence supports a finding that Nelor overcame the presumption of a continued need for inpatient involuntary treatment. Accordingly, we must reverse the order of the trial court.

*Judgment reversed. Miller, P. J., and Doyle, J., concur.*

DECIDED APRIL 7, 2011.

*Stacy S. Levy*, for appellant.
*Daniel J. Porter, District Attorney, John A. Warr, Assistant District Attorney*, for appellee.