**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**February 3, 2016**

# In the Court of Appeals of Georgia

A15A1976. GIBSON v. THE STATE.

PER CURIAM.

On October 29, 2009, Albert Gibson was found not guilty by reason of insanity

for the murder of his mother, the aggravated assault of his brother, and other crimes.[1]

Following an evaluation, Gibson was involuntarily committed to the custody of the

Department of Behavioral Health and Developmental Disabilities ("Department of

Health" or "DBHDD") and confined at the West Central Georgia Regional Hospital

in Columbus, Georgia ("West Central"). See OCGA § 17-7-131 (e) (4). In April

2013,[2] Gibson petitioned the court for release from confinement, see OCGA § 17-7-

---

[1] Both Gibson and the State consented to this finding.

[2] It appears that a status conference was also held in 2011 and that Gibson's
status remained unchanged after that hearing.

131 (f), but his petition was denied. Approximately one year later, Gibson filed another petition requesting a hearing on the issue of whether he continued to meet the criteria for involuntary inpatient confinement. The trial court held another hearing, at which time Gibson clarified that he was seeking a conditional release to be moved from West Central to a less restrictive, group home. See OCGA § 37-3-1 (9.1), (10), & (12.1). The trial court denied Gibson's petition based on a finding that Gibson failed to carry his burden of proving by a preponderance of the evidence that he no longer requires involuntary inpatient confinement. Gibson appeals, arguing that the trial court erred by finding he failed to carry his burden of proof to show that he meets the criteria for conditional release from confinement at West Georgia. As more fully set forth below, we now affirm.

Pursuant to OCGA § 37-3-1 (9.1) (A) (i) & (ii), involuntary inpatient treatment is required for a mentally ill person

> [w]ho presents a substantial risk of imminent harm to that person or others, as manifested by either recent overt acts or recent expressed threats of violence which present a probability of physical injury to that person or other persons; or (ii) [w]ho is unable to care for that person's own physical health and safety as to create an imminently life-endangering crisis.

2

Under OCGA § 17-7-131 (e) (5), a trial court may conditionally release a defendant who has been found not guilty by reason of insanity and involuntarily committed as an inpatient if the defendant subsequently meets the requirements for outpatient treatment under OCGA §§ 37-3-1 (12.1) and 37-3-90.[3] See also *Gray v. State*, 295 Ga. App. 737, 737, n.1 (673 SE2d 84) (2009). A mentally ill defendant who petitions for release from involuntary inpatient commitment has the burden of rebutting the presumption of the need for continued inpatient treatment and proving by a preponderance of the evidence that inpatient involuntary treatment is no longer required. *Nagel v. State*, 262 Ga. 888, 889 (1) (427 SE2d 490) (1993); *Nelor v. State*, 309 Ga. App. 165, 165-66 (709 SE2d 904) (2011); *Gray v. State*, 295 Ga. App. at 737. "The trial court, rather than mental health professionals, has the responsibility

---

[3] OCGA § 37-3-1 (9.2) provides that "'Inpatient treatment' or 'hospitalization' means a program of treatment for mental illness within a hospital facility setting." Pursuant to subsection (12.2), "'Outpatient treatment' means a program of treatment for mental illness outside a hospital facility setting" which includes certain services "to alleviate or treat the patient's mental illness so as to maintain the patient's semi-independent functioning and to prevent the patient's becoming an inpatient." Although Gibson attempts to characterize his request as seeking transfer to a state-run group home for "involuntary *inpatient* treatment," he acknowledged at the hearing on his petition that in order to obtain release to the group home, he was required to show that he no longer meets the criteria for "hospitalization," which means that, notwithstanding his characterization of his request, he is in fact seeking a release from inpatient commitment.

for deciding applications for release," *Nagel*, 262 Ga. at 889 (1), and is required to weigh the evidence in light of the defendant's burden to overcome the presumption of insanity. Id. at 891-93 (2) (a) & (b); *Newman v. State*, 314 Ga. App. 99, 100 (722 SE2d 911) (2012). In ruling upon an inpatient's application for release, the trial court acts as the factfinder and determines the credibility of witnesses and the probative value of the testimony concerning whether the defendant should be released and is required to "consider all credible and relevant expert and other evidence presented at the [release] hearing and contained in the trial record on the issue of conditional release." *Gray v. State*, 295 Ga. App. at 737.

On appeal from the trial court's decision, we review the evidence in the light most favorable to the State and determine whether a rational trier of fact could have found that the defendant failed to prove by a preponderance of the evidence that he or she is no longer in need of involuntary inpatient treatment. *Nagel*, 262 Ga. at 892 (2) (b); *Nelor*, 309 Ga. App. at 166. In order to carry out this standard of review, the trial court must make specific findings regarding the evidence and set out his or her conclusions. *Nagel*, 262 Ga. at 892-93 (2) (b); *Newman*, 314 Ga. App. at 100.

Viewed in this light, the evidence presented at the hearing shows that Gibson has a long history of mental illness and had been admitted to psychiatric hospitals

4

seven or eight times prior to the time he perpetrated the acts that led to his involuntarily confinement at West Central, where he had been involuntary confined for approximately five years at the time of the hearing.[4] Gibson's most current diagnosis at that time was schizoaffective disorder, bipolar type, and polysubstance abuse.

Gibson, two expert witnesses, and one non-expert witness testified at the hearing on his motion.[5] Gibson acknowledged that in the past he was delusional and experienced hallucinations, but said his psychosis is now controlled by medications to the point that he feels "completely normal." Gibson testified that he gets along well with the other patients and staff at the hospital, participates in activities, and has been granted certain privileges, such as moving around the hospital grounds unattended and going off the hospital grounds on supervised excursions. Gibson testified that on one such excursion he saw his brother in a restaurant, but he did not approach him

---

[4] Gibson had been incarcerated for four years prior to his commitment at West Central.

[5] Gibson's two experts witnesses were Dr. John Parmer and Angelina Fontanez. Dr. Parmer has a Ph.d in psychology and is a licensed psychologist at West Central. Fontanez has a masters degree and is also licensed to practice psychology in Georgia. Parmer had been professionally involved with Gibson since 2009, and Fontanez's testimony was based on her interview with Gibson and a review of his records prior to the hearing.

because Gibson did not know how he would react. Gibson also opined that the unwillingness of his relatives to have contact with him was the product of "distorted thinking" because he is now a completely different person.

Gibson was questioned about his prior drug use. He admitted that in the past he had used legal prescription drugs that acted as stimulants, but when questioned about books found in his apartment at the time of his arrest on how to manufacture LSD and methamphetamine, Gibson maintained that he had purchased those books because he had a "fantasy" about "getting people in the illegal [drug] market to give up their illegal practice and work for the benefit of mankind in the legal market." Gibson was also questioned on cross-examination about his financial situation, but he would only answer the State's question after being instructed to do so by the trial court. Gibson then testified that he had approximately $70,000 in savings over which he, not a conservator or family member, had control. He also admitted that he had made statements that it was getting "old" to be hospitalized and that the more he improved the more difficult it became to be around "irrational people that do things that are just crazy."

Dr. Parmer and Angelina Fontanez testified that in their opinion Gibson no longer met the criteria for involuntary inpatient commitment and that he should be

conditionally released to a group home because he had basically gone as far into the recovery process as he could go while hospitalized. Dr. Parmer, whose "Annual Update" report was also introduced into evidence at the hearing, testified that he recommended outpatient commitment instead of outright release because Gibson needed supervision to ensure compliance with treatment recommendations and abstinence from substance abuse, without which Gibson could "relapse into an imminent risk." Dr. Parmer recommended that Gibson be transferred to a group home operated by the DBHDD in Augusta Georgia, or to another comparable DBHDD-run home, where he would reside and be supervised "24/7" by Department staff. However, Dr. Parmer also testified that over time, less supervision might be recommended for Gibson and he might be allowed greater freedom of movement.

Dr. Parmer also testified that while in his opinion Gibson was not currently an imminent risk to himself or others based on his lack of violence or threatening acts toward others and lack of indication of any suicidal ideation, he did have certain concerns about Gibson, especially Gibson's view about medications as a means to feel better and the risk of Gibson attempting to obtain more medication than he needs to control his condition in order to "get a lift." Dr. Parmer testified that although there had been improvements, in the past there had been serious concerns about Gibson's

7

"interpersonal boundaries and relationships," particularly in relation to "his judgment and who he found attractive and wanted to solicit a personal or romantic relationship from." Dr. Parmer's report also stated that Gibson could "react inappropriately" if he became involved with someone who later rejected him, and that he is still "socially awkward" and could be impulsive, although not in a "seriously dangerous manner." Dr. Parmer also testified on cross-examination that he did not agree with Gibson's testimony that he was "recovered" and that because Gibson believed he was recovered, he did not fully appreciate the risks of drifting into certain past behaviors, such as self or over-medicating, and did not understand why others did not believe he was recovered. Additionally, Dr. Parmer testified about Gibson's lack of empathy concerning his family and his lack of understanding concerning why his family did not want a relationship with him. The doctor said this was another reason he recommended continued involuntary commitment, supervision, and psychotherapy. Dr. Parmer acknowledged that Gibson had made remarks expressing frustration with his continued hospitalization and irritation because of "irrational people" who would not allow him to be released even though it had been recommended by his doctors. He explained that one goal of Gibson's therapy was to enable him to understand that such remarks might be misunderstood and not "go over very well in a courtroom."

Further, Dr. Parmer's report reflected that "feeling neglected" was a likely "trigger" for Gibson, who had remarked that other patients at the hospital who caused trouble received more attention than he did and speculated that perhaps he should cause trouble to get more attention.

Dr. Parmer also testified that Gibson had engaged in "doctor shopping" for years and that in the past he had used amphetamines and reportedly used methadone in jail. Based on this prior history, Dr. Parmer said he doubted the credibility of Gibson's testimony that he had purchased the books containing detailed chemical formulas and methods for producing certain drugs for benevolent reasons. Upon questioning by the trial court, Dr. Parmer acknowledged that Gibson could simply not reveal to his doctors if he was delusional or suffering from hallucinations, but he did not believe that Gibson was engaging in that degree of deception. Dr. Parmer also testified, however, that Gibson's behavior indicated that he was probably delusional, but not revealing it. Moreover, he reiterated that his most serious concern was Gibson's limited insight or limited understanding that he has not completely recovered, as well as Gibson's need to be vigilant to avoid triggers and relapse.

Gibson also presented the testimony of William Killings, who had visited Gibson twice a week for the past four years to study the Bible with Gibson. Killings

9

testified that he had never had any problems during his visits with Gibson; that Gibson spoke to him in logical, reasonable terms; and that he did not know the extent of Gibson's "problem" prior to the hearing.

Numerous letters from Gibson's family and others were also introduced by the State at the hearing. These letters expressed adamant opposition to Gibson's release to a group home. These letters noted the trauma that had been inflicted on the family, especially his daughter, because of his actions and their continued fear of Gibson for themselves and/or his family members, including a female family member with whom Gibson had been obsessed since childhood. These letters also expressed "profound concern" if Gibson were released to a less restrictive environment, including that he could find family member's addresses and phone numbers over the internet.[6]

Based on the evidence presented, the trial court found that Gibson continued to present a risk of imminent harm to himself and others, citing the following findings to support its conclusion: 1) the extremely violent nature of the original offenses; 2) Gibson's long history of substance abuse; 3) Gibson's irritation with continued

---

[6] Because Gibson's history of violence was limited to family members and because his family members vehemently opposed his release to outpatient confinement, the recommendation was for Gibson to be housed in a group home that was "a distance away" from his family, although some of the group homes were located in the same area where some of his relatives currently resided.

hospitalization; 4) his relationship patterns; 5) Gibson's statement to treatment providers that he was giving consideration to the idea that if he caused trouble he would get more attention; 6) his lack of personal support; 7) the large financial estate Gibson accumulated while hospitalized; 8) Gibson's high level of intelligence and education; 9) the fact that the female relative toward whom Gibson had previously expressed romantic feelings lives in the area of the group home he was requesting; 10) Gibson's family's adamant opposition to his release and/or transfer; 11) Gibson's long history of mental illness, including eight hospitalizations prior to the offenses that resulted in the current hospitalization; 12) the statements by Dr. Parmer that Gibson may not take his illness seriously and/or may not appreciate the gravity of the offenses; and 13) Dr. Parmer's statement that while there is no evidence to suggest the Defendant is faking his recovery, he is certainly intelligent enough to do so.

Although Gibson argues that the evidence did not support these findings and overwhelmingly showed that he should be released from involuntary inpatient confinement, we find that, viewing the evidence in the proper light, the trial court was authorized to find that Gibson failed to carry his burden to prove by a preponderance of the evidence that he should be conditionally released to outpatient treatment in a

11

group home. Accordingly, the trial court's order denying Gibson's petition for conditional release is affirmed.

*Judgment affirmed. Division Per Curiam. All Judges concur*.